[No. A073752. First Dist., Div. One. July 25, 1997.]

AVERELL SMITH et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

## COUNSEL

Arlo Hale Smith, Timothy DeWitt, Philip A. Larrabee, Pacific Legal Foundation, Anthony T. Caso and Mark T. Gallagher for Plaintiffs and Appellants.

James E. Holst, John F. Lundberg, Fred Takemiya and Mark Himelstein for Defendants and Respondents.

## OPINION

**DOSSEE, J.**—This appeal comes to us after remand proceedings conducted pursuant to the Supreme Court's directive in *Smith* v. *Regents of University*

*of California* (1993) 4 Cal.4th 843, 867-868 [16 Cal.Rptr.2d 181, 844 P.2d 500], certiorari denied 510 U.S. 863 [114 S.Ct. 181, 126 L.Ed.2d 140] (*Smith*), on whether mandatory student fees may be used to support the political activities of the Associated Students of the University of California (ASUC) Senate.[1] The trial court found that the burden on dissenting students' speech and associational rights is justified by the educational value of the student political activity. We affirm that decision.

### FACTS

We need not repeat the facts and procedural history already recited by the Supreme Court. (*Smith*, *supra*, 4 Cal.4th at pp. 848-851.) For our purposes it is sufficient to note that the ASUC is the organization responsible for administration and management of student government and student extracurricular activities on the Berkeley campus. The student government is administered through the ASUC Senate, a body of 30 elected student representatives which operates on a legislative model.

The ASUC Senate meets weekly during the school year, and at those meetings controversial public issues are sometimes presented for debate. A resolution may then be adopted expressing the "ASUC Senate position." The issues upon which the ASUC Senate has taken positions include issues of local, national, and international concern, e.g., gay and lesbian rights, gun control, the reelection of a local United States congressman, a Berkeley initiative to legalize marijuana, and treatment of political prisoners in foreign countries. (*Smith*, *supra*, 4 Cal.4th at pp. 849, 866-867.)

In the remand proceedings, the Regents presented two expert witnesses who testified to the educational benefits of the ASUC Senate's activities not

---

[1] The *Smith* case examined the use of mandatory student fees to support (1) student activity groups; (2) ASUC lobbying efforts; and (3) the ASUC Senate. The Supreme Court ordered a refund procedure with respect to the first two items, but ordered further proceedings on two distinct questions regarding the ASUC Senate's political activities: (1) Are mandatory student fees actually used to support the ASUC Senate's political activities? (2) If so, does the educational value of the ASUC Senate activities justify the burden on dissenting students' rights of free speech and association?

On the first point, the trial court found that income from mandatory student fees is used to fund the ASUC Senate's political activities. In particular, the trial court found that funds are used to operate the building in which senate meetings are held and to produce and copy the agenda and minutes for senate meetings. Further, funds are used to publicize ASUC Senate resolutions through leaflets, press releases, ads in the student newspaper, and senate-sponsored workshops, discussion groups, and rallies. No appeal is taken from that determination.

only for the participants but also for the student body at large.[2] Plaintiffs presented no testimony. Both sides relied upon portions of the evidence from the first trial.

After considering the evidence, the trial court found that the ASUC Senate, as the arm of student government, is an integral part of the university. Its members serve on university committees, and the senate serves as a channel for communication between the students and the faculty and administration.

The trial court further found the following educational benefits from the ASUC Senate's political activities:

1. Government Training. The ASUC Senate simulates the legislative process, providing an opportunity for the student participants to obtain knowledge and skills applicable to a career in politics. Students learn about government operations and election campaigning; they gain practice in public speaking, writing, negotiating, compromising, and exercising leadership.

2. Conflict Resolution. The ASUC Senate provides a forum for conflict resolution to ease tensions, e.g., racial or ethnic conflicts on the campus.

3. Exposure to Diverse Views. As the student government's activities are publicized (see fn. 1, *ante*), the debates within the ASUC Senate on controversial issues assist in disseminating new ideas to all students. Even those students who disagree with the ASUC Senate's resolutions are exposed to the debates and are stimulated to acquire knowledge and to develop tolerance.

4. Engagement in Controversy. The political activities of the ASUC Senate gain the attention of the student body at large, thereby involving students in discussion about the political issues and overcoming apathy. The more controversial the issue, the more likely the students will be engaged. Arousing student interest in political issues of the day prepares students for participation as citizens of a democratic society.

## DISCUSSION

■ The Supreme Court remanded this matter for a determination whether the educational benefits of the ASUC Senate activities justify the

---

[2] The *Smith* court declared that upon remand the Regents would have the burden of proof. (4 Cal.4th at p. 868.)

burden on dissenting students' constitutional rights. (*Smith, supra*, 4 Cal.4th at pp. 867-868.) That task is essentially an act of balancing competing interests: on the one hand, the rights of students who object to being compelled to finance an organization whose political activities they oppose and, on the other hand, the educational judgment of the university that student political activity offers educational benefits. (*Id.* at pp. 852-853.)

## I.  *Burden on Dissenting Students' Rights*

The Supreme Court ruled that the use of mandatory student fees to support political and ideological causes infringes upon the dissenting students' First Amendment rights of free speech and association. (*Smith, supra*, 4 Cal.4th at pp. 852, 867.) On remand, the trial court found that the financial burden on the dissenting students was minimal. Only 4 percent of the total ASUC expenditures was budgeted for the ASUC Senate. Most senate activity has nothing to do with the political and ideological activity complained of here. At most, dissenting students are required to pay 54 cents a year to support ASUC Senate political activities.

Plaintiffs complain that the appropriate focus is not on the financial burden but on the constitutional burden. And plaintiffs complain that the trial court's conclusion is inconsistent with language in *Smith* that the burden on dissenting students is "real and substantial [as] [s]tudents are, in fact, forced to support causes they strongly oppose." (4 Cal.4th at p. 860.)

That language, however, appears in the context of the court's evaluation of the funding of student activity groups. As to the funding of the ASUC Senate's political activities, the Supreme Court did not analyze the substantiality of that burden; the court said only that "if mandatory fees are used for [the ASUC Senate's practice of taking and publicizing positions on political issues] there is a burden on dissenting students' speech and association rights." (4 Cal.4th at p. 867.)

Nevertheless, in remanding the matter for further proceedings, the *Smith* court declared that the burden of proof will be on the Regents to justify the burden on dissenting student's speech and associational rights. (4 Cal.4th at p. 868.) In shifting the burden of proof, the court at least impliedly found a substantial burden on dissenting students' rights. We will therefore accept for purposes of the following discussion that the burden on dissenting students' constitutional rights is significant.

## II.  *Justification*

The *Smith* court held that although the university has a compelling educational interest in supporting student political activities through mandatory

student fees, the infringement on dissenting students' First Amendment rights must be justified beyond a showing that the use of the funds is germane to the university's educational mission.[3] (*Smith, supra,* 4 Cal.4th at pp. 854-855, 860, 862, 868.) The *Smith* court reasoned that the university's educational purpose is extremely broad, "potentially encompass[ing] all of life," and at some point the educational value of supporting political activities becomes incidental to the advancement of political and ideological interests. At that point the subsidized activity becomes constitutionally impermissible, for at that point the burden on the dissenting students' constitutional rights is more than what is necessary to achieve a significant educational goal. (*Id.* at pp. 855, 860.) What the university must demonstrate, then, to justify the expenditure of mandatory fees is that the limit point has not been reached—that the educational benefits provided by the subsidized activity outweigh the advancement of political and ideological interests and are not simply incidental thereto. (*Id.* at pp. 855, 858-859, 860, 862, 868.)

In the present proceedings, the trial court found that the educational benefits were not incidental to the advancement of political and ideological interests. Accordingly, the trial court concluded that the university had established justification for the burden on dissenting students' rights. The parties seem to be in accord that the question before us is a mixed question of law and fact. That is, the nature of the ASUC Senate's activities and the educational benefits afforded thereby are factual determinations, and we are bound by the trial court's factual findings as long as they are supported by substantial evidence. However, the question whether the burden on dissenting students' rights is justified by the educational benefits requires an "exercise [of] judgment about the values that animate legal principles"; hence that question is one of law which we review de novo. (See generally, *Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 800-801 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

A. *Educational Benefits*

The trial court found that the activities of the ASUC Senate have significant educational value. First, the trial court found, based upon the expert testimony presented at trial, that participation in the ASUC Senate teaches specific leadership and advocacy skills to those who choose to participate in the senate activities. Plaintiffs do not dispute these educational benefits. Rather, plaintiffs point to the skepticism expressed by the Supreme Court

---

[3] The Supreme Court criticized our analysis as "incomplete" in that we upheld the student fees as a matter of law because the ASUC Senate activities contribute to the university's educational mission. (4 Cal.4th at p. 867.)

that the activities of the ASUC Senate provide any widespread educational benefits: "To be sure, the ASUC Senate's practice of taking and publicizing positions on political issues may have educational value for those few students who are involved. However, . . . [it remains to be determined] whether the purported educational benefits justify the burden [on dissenting students' rights]." (4 Cal.4th at p. 867.)[4] Relying upon that passage from the *Smith* opinion, plaintiffs argue there was no evidence produced at trial that the activities of the ASUC Senate had any educational benefits for students other than the few participating students.

The trial court, however, found to the contrary. After hearing the expert testimony, the court found significant educational benefits extending well beyond the actual participants in the ASUC Senate activities, extending even to the dissenting students themselves. We quote from the court's findings: "[D]issenting students, like all other students, are receiving the educational benefit of ASUC political activity. They are exposed to the debates and the views of the senators. Although opposing those views, they are stimulated by them, possibly informed by them, and stirred to study the issues and express contrary views. That is part of the educational process and has significant educational value."[5]

## B. *Pursuit of Political Goals*

The *Smith* case instructs that whether the educational benefits justify the burden on dissenting students' constitutional rights depends upon whether the educational value of the political activities has become incidental to the advancement of political and ideological interests. (4 Cal.4th at pp. 855, 860.) Although this test was enunciated with respect to the fees used to subsidize student activity groups, the *Smith* court's directive on remand calls for an analysis of the fees used for the ASUC Senate's political activities in accordance with the same principles. (4 Cal.4th at p. 868.) We discern, however, as did the trial court, critical distinctions between the ASUC Senate and the student activity groups with respect to the pursuit of political or ideological goals.

First, the trial court found that the primary function of the ASUC Senate is to administer student government. The ASUC Senate is an integral part of the administration of the university, responsible for administering the ASUC

---

[4]The *Smith* court said somewhat the same thing about the ASUC lobbying activities: "[T]he educational benefit to a few student lobbyists cannot justify the burden on all students' free speech and associational rights." (4 Cal.4th at p. 866.)

[5]Plaintiffs contend the expert testimony supporting the trial court's findings was weak and unsubstantiated. The credibility of the witnesses and the weight to be given to the testimony were for the trial court to decide.

budget of over $1 million. Its members are elected by the student body. Unlike the student activity groups, which are devoted to advancing particular political and ideological causes, the ASUC Senate's primary function is to govern.

Moreover, the trial court found that within the legislative model upon which the ASUC Senate operates, the process of forging a collective decision, of reaching a resolution on disputed issues, is educationally more important than the actual position taken on the issues. This finding, too, underscores the court's determination that the activities of the ASUC Senate are not dedicated to achieving particular political or ideological ends.

Furthermore, the trial court found that the ASUC Senate provides a campus forum for vigorous discussion on matters of campus and public concern. This finding adds an extra constitutional dimension to the issue at hand, for any effort to limit the topics for debate within the ASUC Senate forum would infringe upon academic freedom.

The United States Supreme Court has long recognized that a special concern of the First Amendment is to foster energetic debate and the free interchange of views, especially in the university setting. (*Rosenberger* v. *Univ. of Virginia* (1995) 515 U.S. 819 [115 S.Ct. 2510, 132 L.Ed.2d 700]; *Regents of University of Michigan* v. *Ewing* (1985) 474 U.S. 214, 226 [106 S.Ct. 507, 514, 88 L.Ed.2d 523], and fn. 12; *University of California Regents* v. *Bakke* (1978) 438 U.S. 265, 312-313 [98 S.Ct. 2733, 2759, 57 L.Ed.2d 750]; *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 603 [87 S.Ct. 675, 683-684, 17 L.Ed.2d 629].) With that principle in mind, a number of lower courts have upheld the use of mandatory student fees to create a forum for the exchange of ideas. (E.g., *Hays County Guardian* v. *Supple* (5th Cir. 1992) 969 F.2d 111, 123-124 [student newspaper]; *Kania* v. *Fordham* (4th Cir. 1983) 702 F.2d 475, 479-480 [same]; *Arrington* v. *Taylor* (M.D.N.C. 1974) 380 F.Supp. 1348, 1362-1363 [same]; *Veed* v. *Schwartzkopf* (D.Neb. 1973) 353 F.Supp. 149, 152, 153 [student newspaper and speakers' program]; *Larson* v. *Board of Regents of University of Neb.* (1973) 189 Neb. 688 [204 N.W.2d 568, 571] [same]; see *Good* v. *Associated Students of Univ. of Washington* (1975) 86 Wn.2d 94 [542 P.2d 762, 768-769] [student newspaper].)

The *Smith* court found this body of case law largely irrelevant to its analysis of the student activity groups, as none of the groups was *itself* a public forum; each group was devoted to advancing its own political or

ideological causes. (*Smith*, *supra*, 4 Cal.4th at p. 856, fn. 8.)[6] The trial court's finding that the ASUC Senate *itself* serves as a forum for political advocacy marks a pertinent distinction between the activities of the ASUC Senate and the activities of the student groups evaluated in *Smith*.

Based upon the trial court's factual findings on the nature of the ASUC Senate's political activities and on the significant educational value resulting therefrom, we have no hesitation in reaching the independent legal conclusion that the educational benefits afforded by the activities of the ASUC Senate are not "incidental" to a dedication of achieving political or ideological ends. We therefore hold that the burden on dissenting students'.rights is justified.

### C.   *Less Drastic Means*

Plaintiffs argue that even if the educational benefits of the senate's political activities are found to predominate, the activities must meet an additional test; they must also be the least drastic means of accomplishing the educational goal. Plaintiffs place great emphasis on the *Smith* court's statement, "The University can teach civics in other ways that involve a lesser burden on those rights . . . ." (4 Cal.4th at p. 855.)

We disagree with plaintiffs' reading of the *Smith* case. The *Smith* court quite clearly explained that its formulation of the test for evaluating the use of mandatory student fees—whether the educational benefits are merely incidental to the activity's primary function of advancing political or ideological interests—was simply an alternative formulation of the test broadly applicable in First Amendment cases: "[U]se of funds [to support student political activity] can be germane to the university's educational mission. [Citations.] At some point, however, the educational benefits that a group offers become incidental to the group's primary function of advancing its own political and ideological interests. [Citations.] To fund such a group may still provide some educational benefits, but the incidental benefit to education will not usually justify the burden on the dissenting students' constitutional rights. *Phrased in terms of the tests that courts have applied, a*

---

[6]The *Smith* court focused on the agenda of the individual student activity groups rather than on the collective effect of supporting various student groups advocating divergent political or ideological views, i.e., that the campus *as a whole* thereby becomes a forum, a marketplace of ideas. As the United States Supreme Court has observed, ". . . the campus of a public university, at least for its students, possesses many of the characteristics of a public forum. . . . 'The college classroom with its surrounding environs is peculiarly "the marketplace of ideas." ' " (*Widmar* v. *Vincent* (1981) 454 U.S. 263, 267, fn. 5 [102 S.Ct. 269, 273, 70 L.Ed.2d 440], quoting *Healy* v. *James* (1972) 408 U.S. 169, 180 [92 S.Ct. 2338, 2346, 33 L.Ed.2d 266].)

*regulation that permits the mandatory funding of such groups is not " 'narrowly drawn to avoid unnecessary intrusion on freedom of expression'* [citations], and it 'unnecessarily restrict[s] constitutionally protected liberty, [when] there is open a less drastic way of satisfying its legitimate interest' [citation]. [¶] *One can reach the same result by applying the Carroll court's alternative formulation of the test. When mandatory funding is being used to create an incidental benefit to education at the cost of a significant burden on constitutional rights, it cannot usually be said that the state is 'promot[ing] a substantial government interest that would be achieved less effectively absent the regulation.'* [Citation.]" (4 Cal.4th at p. 860, italics added.)

The principle reiterated by the *Smith* court that a regulation must be " ' "narrowly drawn to avoid unnecessary intrusion" ' " (4 Cal.4th at pp. 856, 858, 860) is not an *additional* test. Rather, that principle is the general constitutional standard by which the *Smith* court was evaluating whether the burden on dissenting students' rights was justified. The *Smith* court held that when the point is reached at which the goal of advancing political or ideological interests outweighs the goal of educating the students, then the subsidy provided by student fees is no longer "narrowly drawn to avoid unnecessary intrusion." It is at that point that the burden on dissenting students' constitutional rights is "more . . . than is necessary to achieve any significant educational goal." (4 Cal.4th at p. 855.)

Plaintiffs misconstrue the statement in *Smith* that the university "can teach civics in other ways" to mean that the university may not subsidize the ASUC Senate's political activities if the educational benefits derived therefrom can be offered in other, less intrusive ways.[7] That statement, however, comes at the end of a paragraph explaining the limiting point for using mandatory fees for political activities. When the court's statement is placed in its full context, the statement signifies simply that when the point is reached that the educational value of student political activity is incidental to (or outweighed by) the advancement of political or ideological goals, then the mandatory funding is constitutionally impermissible and *then* the university must find other means of educating its students—"other ways that involve a lesser burden on [constitutional] rights, or no burden at all." (4 Cal.4th at p. 855.)

Here, because we have determined, as did the trial court, that the educational benefits of the ASUC Senate's political activities are *not* incidental to

---

[7]Plaintiffs point to evidence that the educational benefits derived from the ASUC Senate's practice of adopting resolutions on political issues could be obtained through other campus programs that are not financed by dissenting students, e.g., internships or student political groups.

the advancement of particular political or ideological interests, the question does not arise whether the university could accomplish the same educational goals in some other way. Indeed, as the Supreme Court has acknowledged in *Smith* and elsewhere, considerable discretion lies with the Regents to determine how best to carry out the university's educational mission. (*Smith, supra,* 4 Cal.4th at p. 852; see also *San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 788 [163 Cal.Rptr. 460, 608 P.2d 277]; *Goldberg* v. *Regents of the University of California* (1967) 248 Cal.App.2d 867, 874 [57 Cal.Rptr. 463].) As long as the subsidized political activity has not crossed the line, as long as the pursuit of educational goals has not become merely incidental to pursuit of political or ideological goals, then the courts will not interfere with the educational judgment of the Regents and will not examine how the university's educational goals should be fulfilled.

The judgment is affirmed.

Strankman, P. J., and Stein, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 15, 1997.