[No. F028993. Fifth Dist. May 17, 1999.]

RONALD SMITH, Plaintiff and Respondent, v.
FRESNO IRRIGATION DISTRICT, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Horvitz & Levy, Sandra J. Smith, Ari R. Kleiman; Brown & Peel, Carl L. Brown and R. Ernest Montanari for Defendant and Appellant.

Oliver & Duncan, Donald E. Oliver and Karen E. Duncan for Plaintiff and Respondent.

**OPINION**

**LEVY, J.—**

## INTRODUCTION

Defendant Fresno Irrigation District challenges two rulings of the trial court: (1) the determination that plaintiff Ronald Smith was not required to exhaust the district's internal grievance procedure prior to filing suit for wrongful termination; and (2) the ruling that plaintiff was not in a safety-sensitive position and hence the random drug test which plaintiff was required to take violated his constitutional right to privacy and his right to be free of unreasonable searches and seizures.

In the unpublished portion of this opinion, we will affirm the trial court's ruling that plaintiff's suit was not barred by his failure to exhaust the district's internal grievance procedure. However, upon a de novo review of plaintiff's constitutional claims, we will find that the random drug test was

justified by the hazards inherent in plaintiff's employment and, hence, the judgment entered in favor of plaintiff must be reversed.[1]

BACKGROUND FACTS

Plaintiff was hired by the Fresno Irrigation District (District) in February 1989. The District is an independent state agency responsible for water distribution and flood control. (Wat. Code, § 20570.) During the irrigation season, which generally spanned the months of March to September, plaintiff worked as a ditchtender. Plaintiff was employed the balance of the year as a construction and maintenance worker for the District.

After consultation with representatives of the employees association, the District adopted a "Drug-Free Work Safety Program Substance Abuse Policy" (Substance Abuse Policy) for all of its employees in July 1994. The stated purpose of the policy was to: (1) further enhance safety in the workplace for all employees; (2) promote employee health; (3) maintain a high level of quality in the service to the public; (4) improve productivity; (5) provide protection against public liability; and (6) promote the public's trust in the District.

Under the policy, those employees who worked in safety-sensitive positions were required to take random tests for drugs and alcohol.[2] The District employed a computerized random number generator to determine which employee would be tested and on what date the testing would occur. The policy called for an average of two tests per classified employee each calendar year. The policy defined " 'Safety sensitive' positions" as those "which as a normal course of business require the employee to operate District vehicles or heavy equipment, or those positions in which the employee's performance, reflexes, and/or judgment impact the safety of others."

The list of positions deemed safety sensitive was developed by management. Although the Substance Abuse Policy was adopted by the District's board of directors, the list of positions deemed safety sensitive was not itself

---

[1]Plaintiff's request, pursuant to California Rules of Court, rule 23(a), that we make specific findings of fact is denied. As discussed more fully below, this appeal presents legal questions. No findings of fact are necessary.

[2]Drug and alcohol testing was also required of: (1) all prospective employees as part of their prehire health screening; (2) any employee involved in an injury accident or a property damage accident wherein the amount of property loss was estimated to exceed $1,000; (3) any employee found in possession of a controlled substance or drug paraphernalia; (4) any employee engaged in suspicious behavior; (5) all employees with special class drivers' licenses as part of their periodic physical examination; and (6) any employee who volunteered for recovery treatment during the introductory grace period.

adopted by the board. Out of 32 positions within the District, 23 were found to be safety sensitive. Both the position of ditchtender and the position of construction and maintenance worker were deemed safety sensitive. Only positions which were more clerical in nature were found not to be safety sensitive. All management positions were deemed safety sensitive. Management designated their own jobs safety sensitive due to the type of responsibilities inherent in their positions and as a show of support for the District's drug-free policy.

After the Substance Abuse Policy was adopted, the District informed its employees of the provisions of the policy. Under the policy, any employee who had a substance abuse problem was given a "grace period" of six months in which to obtain counseling and treatment without risk of termination. However, after the grace period expired on January 1, 1995, any employee who tested positive for any amount of any illegal drug would be terminated. During the six-month period between the adoption of the policy and implementation of the drug testing program, plaintiff attended several informational sessions held by the District and was vocal in his opposition to the policy.

On January 9, 1995, plaintiff was told to report to an independent testing laboratory and to submit to a urine test for drugs. The results of the test were positive for amphetamines, methamphetamines and marijuana. Plaintiff was suspended from duty on January 11, 1995, and was told to report to the controller of the District. Plaintiff did not report to the controller as requested.

Plaintiff received a written termination notice on January 13, 1995. The notice advised plaintiff that he had a right to file a grievance, to have a hearing before the general manager or his designee, and to appeal any decision to the board of directors. Plaintiff did not attend a meeting with the District's representative on January 17, 1995. This meeting had been scheduled for appellant by the District's manager to give plaintiff the opportunity to appeal his termination.

On January 31, 1996, plaintiff filed a complaint for wrongful termination in violation of public policy, invasion of privacy under the California Constitution, and for violation of his Fourth Amendment right under the federal Constitution to be free of unreasonable searches and seizures. The constitutionality of the District's drug testing policy and whether this policy was justified by the safety-sensitive nature of plaintiff's employment was bifurcated and tried as a matter of law before the court sitting without a jury.

The court initially heard argument on the District's affirmative defense that plaintiff's suit should be dismissed as a result of plaintiff's failure to

exhaust the District's internal grievance procedure. The trial court found the District's internal procedures too informal and confusing to require adherence thereto.

A three-day trial was conducted to determine if the safety concerns inherent in plaintiff's employment justified the random drug test. The nature of plaintiff's employment and the general job descriptions for the positions of ditchtender and construction and maintenance worker were not disputed by plaintiff. Evidence was received with respect to the types of duties inherent in both positions. However, because plaintiff was drug tested during his employment as a construction and maintenance worker, and because he was terminated therefrom, the constitutional validity of the test must focus on the safety sensitivity of that position. We therefore deem it unnecessary to discuss the evidence presented by the parties with respect to the ditchtender position.

There were many reasons why the District deemed the position of construction and maintenance worker safety sensitive. The former general manager of the District testified that the hazards connected with the construction and maintenance work in the District were unique. The workers built pipes, forms, diversions and bridges, however, what made these particular duties especially hazardous was the fact that the structures were built in and around dirt trenches.

The trenches were typically 10 feet deep. Given this environment, there was always the possibility that a worker might fall into a trench or onto forms with exposed rebar uprights. If the construction work was to be performed *in* a trench, there was a "risk of cave-in or slides." The possibility that a trench might collapse was aggravated by the fact the employees had to climb in and out of the trench with tools and heavy equipment. Additional reasons for the safety-sensitive classification included the fact that employees operated power tools and heavy equipment in close proximity to one another and the fact that employees were required to crawl through sections of pipe in order to make needed repairs.

Construction and maintenance workers always worked in a crew. Since the District was in the process of replacing its water delivery system with pipes, plaintiff would sometimes be called upon to work in a crew responsible for casting and placing pipes in a trench. This job required a crew of four. One worker would stand on the bank of the ditch and oil the forms to be used in casting the pipe in place. The forms weighed 50 pounds or more. The oiled form would be handed by the first worker to a second who worked on the casting machine. A third worker in the casting machine would set the

oiled form in the machine. A fourth worker, who was also located in the machine, would trowel the imperfections in the pipe as the machine advanced. Apart from the ever-present hazard of a cave-in, an aspect of this job which was particularly hazardous was the 20- to 25-foot boom which would swing back and forth as the concrete was being poured into the cast and place pipe machine.

Plaintiff's job duties also included constructing forms for the gates, pouring concrete to prevent erosion around gates, and weed and brush abatement. In the performance of these duties plaintiff operated a jackhammer, skill saw, chain saw, chipper and roto-hammer. A coworker thought the chipper was a particularly dangerous piece of equipment due to the potential of injury or loss of life if loose clothing got caught on the blades and the worker was pulled into the machine.

Plaintiff also operated a piece of heavy equipment called a sloper. A sloper was used to shape and clean the ditch. The sloper was not self-propelled. It would be attached to a Caterpillar, which was operated by a second member of the crew. The Caterpillar would pull the sloper into and out of the ditch. On one occasion, the sloper which plaintiff was operating turned over as it was being pulled into the ditch. Fortunately, the sloper did not cause the Caterpillar to turn over and neither worker was injured.

Another piece of equipment which plaintiff operated was the boom on the back of a construction truck. The boom was used to lift items on and off the truck and to lower pipe sections to workers in the trench. It had the capacity to lift items weighing as much as 1,500 pounds.

Plaintiff's coworkers testified that pipe crawling was one of the more disagreeable and dangerous jobs within the District. What made it dangerous was "[k]nowing that there's water behind gates that are closed that could flood the line within minutes if something happened or a shutter on a gate broke or somebody opened the gate . . . ." Plaintiff's safety expert opined that the pipe-crawling portion of plaintiff's job was extremely hazardous due to the narrow confines of the pipe (generally between 30 to 66 inches) and the distances (a half mile or less) which the worker was required to crawl in order to reach the section of the pipe which needed repair.

Whenever a member of the crew had to crawl through a pipe, another worker in the crew was required to be the "top man." This person was responsible for the safety of the worker in the pipe. The top man would stand near the opening in the pipe and listen for any calls for assistance. He had to make sure that water or toxic fumes were not released into the pipe and,

additionally, that a cave-in did not occur. The top man had to be ready to mount a rescue if that became necessary. The difficulty of a rescue was increased due to the fact there was no radio communication between the top man and the pipe crawler; nor was the person crawling the pipe tethered. Plaintiff's foreman testified that plaintiff had been called upon to be the top man; plaintiff testified that he occasionally had to crawl through pipes in order to make needed repairs.

Due to the greater potential for injury, the District's workers' compensation rate for construction and maintenance workers was twice as high as that for ditchtenders. The rate for ditchtenders was 10 times as high as that for clerical workers.

The trial court found that the District had a substantial interest in improving safety in the workplace, in creating a drug-free environment and in increasing the efficiency of the District's organization; however, it did not find that these interests outweighed the employee's Fourth Amendment and privacy interests. The court found that although there were certain hazards connected with plaintiff's duties, his positions were not "essentially hazardous positions" and plaintiff's employment did not involve a significant hazard to the safety of others. The court therefore found that plaintiff did not occupy a safety-sensitive position and further found that the random drug testing was a violation of plaintiff's constitutional rights. In reaching this decision, the trial court found particularly persuasive the definition of "Sensitive Positions" in California Code of Regulations, title 2, sections 599.960 and 599.961.[3]

The issue of damages was tried. The jury awarded plaintiff $240,000 plus costs.

## DISCUSSION

I. *Plaintiff's failure to exhaust the District's internal grievance procedure.*[*]

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

[3]The parties are in agreement that these regulations do not apply to the District's employees. Given that the parties concede the District was not required to follow these regulations, we do not find the regulations helpful in resolving the constitutional question presented herein.

[*]See footnote, *ante*, page 147.

II. *Constitutionality of random drug testing of an employee in a position designated "safety sensitive."*

A. *Standard of Review*

The first issue we must address is the standard of review on appeal. Plaintiff argues that a substantial evidence standard applies. The District contends that the trial court resolved a predominately legal question of mixed law and fact. Therefore, the ruling is subject to independent review on appeal.

The parties agree that the matter was tried by the trial court as a question of law. When plaintiff argued his case to the trial court, he acknowledged that the facts were not in dispute as to "what the man did, what his job description was." At trial, plaintiff maintained that the issue was one of law for the trial court to resolve in light of the fact there was no factual dispute about the nature of plaintiff's work. Plaintiff relied upon the *Luck* decision in arguing that the only dispute was whether that work was safety sensitive. (*Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 21 [267 Cal.Rptr. 618], criticized on another point in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 56-57 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

However, on appeal, having been successful at the trial level, plaintiff argues that there were factual disputes and hence the trial court's ruling must be affirmed if it is supported by substantial evidence. Without specifying the nature of the factual disputes resolved in his favor, plaintiff argues that we must affirm the trial court's findings that his positions were not safety sensitive because they were not "essentially hazardous positions" and because his employment posed no significant hazard to others.

These "findings" are the conclusions which the trial court reached when it applied the undisputed material facts to the law. Whether a position has been correctly designated "safety sensitive" requires application of a legal standard. (*Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, 899-900, fn. 25 [59 Cal.Rptr.2d 696, 927 P.2d 1200].) We therefore agree with the District that the question presented to the trial court was a predominately legal question of mixed law and fact.

Whenever a question of mixed law and fact exists, three steps are involved: (1) the establishment of basic, primary or historical facts; (2) the selection of the applicable law; and (3) the application of law to the facts. (*Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960].) All three trial court determinations are subject to appellate

review: (1) questions of fact are reviewed by giving deference to the trial court's decision; (2) questions of law are reviewed under a nondeferential standard, affording plenary review; and (3) application of law to fact is reviewed under a clearly erroneous standard if the inquiry is essentially factual. However, where, as here, the question implicates constitutional rights necessitating consideration of legal concepts in the mix of fact and law, and an exercise of judgment about the values that animate legal principles, the factors favoring de novo review predominate. (*Id.* at pp. 800-801; *People* v. *Louis* (1986) 42 Cal.3d 969, 987 [232 Cal.Rptr. 110, 728 P.2d 180], disapproved on other grounds in *People* v. *Mickey* (1991) 54 Cal.3d 612, 672, fn. 9 [286 Cal.Rptr. 801, 818 P.2d 84]; *Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at pp. 40, 47.)

██ Plaintiff's suit challenges the constitutionality of the District's attempt to reduce the hazards inherent in his position through a random drug testing policy. The constitutional question raised by plaintiff requires consideration of legal concepts and involves the exercise of judgment about the values underlying legal principles. Conclusions of this sort are reviewed de novo. (*Smith* v. *Regents of University of California* (1997) 56 Cal.App.4th 979, 984 [65 Cal.Rptr.2d 813].)

We therefore reject plaintiff's assertion that a substantial evidence standard applies. As in *Luck*, we must resolve de novo whether plaintiff was employed in a safety-sensitive position. (*Luck* v. *Southern Pacific Transportation Co.*, *supra*, 218 Cal.App.3d at p. 21.)

B. *Overview of Applicable Constitutional Principles*

Plaintiff's complaint alleged that the random drug test was a violation of his Fourth Amendment right to be free of unreasonable searches and seizures under the federal Constitution and a violation of his right to privacy under the state Constitution. (Cal. Const., art. I, § 1.) Plaintiff's Fourth Amendment challenge stemmed from the fact he was employed by a governmental entity. (*Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 614 [109 S.Ct. 1402, 1411-1412, 103 L.Ed.2d 639]; *Vernonia School Dist. 47J* v. *Acton* (1995) 515 U.S. 646, 652 [115 S.Ct. 2386, 2390, 132 L.Ed.2d 564].)

Similar standards govern drug testing under the federal and state Constitutions. Under both Constitutions, an individualized suspicion of drug use is not always required. (*Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. 602 [drug and alcohol testing of all crew members on a train involved in a relatively serious accident is constitutional]; *Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, 677 [109 S.Ct. 1384, 1397, 103 L.Ed.2d 685]

[drug testing of employees seeking transfer or promotion within the United States Customs Service is constitutional given the employee's direct involvement in drug interdiction, requirement to carry a firearm or the necessity of handling "truly sensitive information"]; *Loder* v. *City of Glendale*, *supra*, 14 Cal.4th at pp. 853, 876 [drug testing of all job applicants does not violate state constitutional right to privacy].)

■ The determination whether a particular drug test is constitutionally permissible is derived from a balancing test. Under federal law, the ultimate measure of the constitutionality of a governmental search is reasonableness. (*Vernonia School Dist. 47J* v. *Acton*, *supra*, 515 U.S. at p. 652 [115 S.Ct. at p. 2390] [random drug testing of student athletes is constitutional].) To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. (*Id.* at pp. 670-671 [115 S.Ct. at p. 2399].) However, particularized exceptions to the main rule are sometimes warranted based on " ' "special needs, beyond the normal need for law enforcement." ' " (*Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. at p. 619 [109 S.Ct. at p. 1414].)

Whether a drug test meets the reasonableness standard is " 'judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " (*Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. at p. 619 [109 S.Ct. at p. 1414].) A finding of reasonableness does not require that the " 'least intrusive' " search practicable be conducted. (*Vernonia School Dist. 47J* v. *Acton*, *supra*, 515 U.S. at p. 663 [115 S.Ct. at p. 2396].) Although both the *Skinner* and *Von Raab* decisions characterized the government interest motivating the drug test as "compelling," the United States Supreme Court clarified this reference as describing only an interest important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy. (*Vernonia*, *supra*, 515 U.S. at p. 661 [115 S.Ct. at pp. 2394-2395].)

The California Supreme Court has similarly rejected a compelling interest standard in favor of a balancing test for all invasions of privacy except those which involve "an obvious invasion of an interest fundamental to personal autonomy," such as freedom from involuntary sterilization or the freedom to pursue consensual family relationships. (*Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at pp. 34-35, 56.) The constitutionality of a drug test is evaluated by weighing and balancing the legitimacy or strength of the justification for the conduct against the intrusion on a protected privacy interest. (*Loder* v. *City of Glendale*, *supra*, 14 Cal.4th at pp. 893-894.)

Instead of a compelling interest, the entity seeking the drug test must establish a " 'legitimate' " or " 'important' " reason for its drug testing

program. (*Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at pp. 56-57.) "Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise." (*Id.* at p. 38.) Once the privacy interests of the individual to be drug tested are balanced against the competing countervailing interests of the defendant, the plaintiff may rebut the defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to the defendant's conduct which have a lesser impact on privacy interests. (*Id.* at p. 40.)

C. *Overview of Case Law Discussing Random Drug Testing in the Workplace*

The most recent California Supreme Court decision addressing the constitutionality of drug testing in the workplace is *Loder* v. *City of Glendale*, *supra*, 14 Cal.4th 846. The majority in *Loder* found the City of Glendale's policy of testing all current employees seeking promotion to be constitutionally overbroad. Across-the-board testing of all current employees seeking promotion was viewed as inconsistent with the *Von Raab* decision. The United States Supreme Court therein discussed in detail both the nature of the job categories to which the. drug testing program applied and the special importance of the governmental interest in ensuring that persons who use illegal drugs are not promoted or transferred into such positions. (*Id.* at p. 878.)

After finding the city's drug testing program overbroad, the majority in *Loder* declined to review all city jobs, position-by-position, to determine whether a suspicionless drug testing requirement may be constitutionally applied to an employee promoted to a particular position. (*Loder* v. *City of Glendale*, *supra*, 14 Cal.4th at pp. 898-899.) The court recognized that drug testing for promotion into safety-sensitive positions had been found constitutional under federal authorities. (*Id.* at p. 881, fn. 12.) Although the court declined to specify the elements inherent in a safety-sensitive position, it did offer the advice that the Court of Appeal in *Loder* set forth an overly restrictive standard in holding that such testing is permissible only for positions in which an employee's inability to perform his or her duties could have an " 'immediate disastrous consequence upon public safety or security.' " (*Id.* at p. 899, fn. 25.)

The constitutionality of random drug testing under the Fourth Amendment of the federal Constitution has been the subject of numerous opinions. (*Kraslawsky* v. *Upper Deck Co.* (1997) 56 Cal.App.4th 179, 187, fn. 8 [65

Cal.Rptr.2d 297], referencing *American Fed. of Gov. Emp.* v. *Roberts* (9th Cir. 1993) 9 F.3d 1464, one of many federal opinions arising out of a 1986 executive order directing each agency in the executive branch to establish a program to test employees in sensitive positions for the use of illegal drugs.) Cases generally hold that a drug test of an existing employee without any individualized suspicion is unreasonable unless the employee is in a safety- or security-sensitive position. (*Kraslawsky* v. *Upper Deck Co.*, *supra*, 56 Cal.App.4th at p. 187, fn. 8; *Kemp* v. *Claiborne County Hosp.* (S.D.Miss. 1991) 763 F.Supp. 1362, 1367 [the safety sensitivity of an employee's job is a highly important factor in the balancing test to determine the reasonableness of a drug testing procedure].)

The United States Supreme Court's most recent opinion on suspicionless drug testing held that a requirement of drug testing for all state office candidates did "not fit within the closely guarded category of constitutionally permissible suspicionless searches." The court noted, however, that the balance of constitutionality would shift if the elected officials performed "high-risk, safety-sensitive tasks." (*Chandler* v. *Miller* (1997) 520 U.S. 305, 309, 321-322 [117 S.Ct. 1295, 1298, 1305, 137 L.Ed.2d 513, 145 A.L.R. Fed. 657].)

Federal cases which have upheld the constitutionality of random suspicionless drug testing of current employees include the following: (1) *Intern. Broth. of Teamsters* v. *Dept. of Transp.* (9th Cir. 1991) 932 F.2d 1292 (random testing of commercial drivers of vehicles in excess of 26,000 pounds, vehicles with 15 or more passengers, or drivers who transport hazardous materials); (2) *IBEW, Local 1245* v. *Skinner* (9th Cir. 1990) 913 F.2d 1454, 1456 (random drug testing of natural gas and hazardous liquid pipeline employees); (3) *Hartness* v. *Bush* (D.C. Cir. 1990) 919 F.2d 170, 173 [287 App.D.C. 61] (random testing of government employees with "secret" national security clearances); (4) *Bluestein* v. *Skinner* (9th Cir. 1990) 908 F.2d 451, 454-458 (random testing of aviation personnel); (5) *Taylor* v. *O'Grady* (7th Cir. 1989) 888 F.2d 1189, 1199 (yearly random test of correctional officers who have contact with prisoners); (6) *American Federation of Gov. Employees* v. *Skinner* (D.C. Cir. 1989) 885 F.2d 884, 889-893 [280 App.D.C. 262] (random testing of transportation employees in positions with direct impact on public health and safety); (7) *IBEW, Local 1245* v. *U.S. NRC* (9th Cir. 1992) 966 F.2d 521, 526 (random testing of nuclear power plant workers who have unescorted access to "protected areas" of nuclear facilities); (8) *National Treasury Employees Union* v. *Yeutter* (D.C. Cir. 1990) 918 F.2d 968, 971-972 [287 App.D.C. 28] (random testing of Department of Agriculture employees operating motor vehicles carrying passengers); (9) *Thomson* v. *Marsh* (4th Cir. 1989) 884 F.2d 113 (random testing of civilian employees of chemical weapons plant who have

access to areas in which experiments are performed); (10) *Jones* v. *Jenkins* (D.C. Cir. 1989) 878 F.2d 1476 [279 App.D.C. 19] (drivers of and attendants on school buses for handicapped children; testing was conducted as part of routine medical examination); and (11) *National Federation of Federal Employees* v. *Cheney* (D.C. Cir. 1989) 884 F.2d 603, 610, 613 [280 App.D.C. 164] (random testing of civilian employees within the Army who were in critical positions was found constitutional; the tested employees included air traffic controllers, pilots, aviation mechanics, flight attendants, civilian police and guards).

The parties herein are in agreement that if plaintiff is found to have been employed in a safety-sensitive position, the random drug test which resulted in his termination is constitutionally valid under both the federal and state Constitutions.

D. *Constitutionality of District's Drug Testing Policy*

   1. *Plaintiff's constitutional interests.*

Under both federal and state Constitutions, the collection and testing of urine implicates an employee's constitutional rights. (*Skinner* v. *Railway Labor Executives' Assn., supra,* 489 U.S. at p. 617 [109 S.Ct. at p. 1413]; *Chandler* v. *Miller, supra,* 520 U.S. at p. 311 [117 S.Ct. at p. 1300]; *Loder* v. *City of Glendale, supra,* 14 Cal.4th at pp. 876, 896.)

Plaintiff's expectation of privacy has two components. ▮ Protected privacy interests under the state Constitution include: (1) an interest in making intimate personal decisions or conducting personal activities without observation, intrusion or interference (autonomy privacy) and (2) an interest in precluding the dissemination or misuse of sensitive and confidential information (informational privacy). (*Hill* v. *National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 35.)

With regard to plaintiff's interest in "autonomy privacy," plaintiff's urine sample was taken at a medical clinic in as minimally intrusive a manner as possible. There apparently was no direct monitoring of plaintiff as he provided the urine sample. Indirect monitoring of the collection process has been described as a negligible intrusion into the privacy interests compromised by the process of obtaining the urine sample. (*Vernonia School Dist. 47J* v. *Acton, supra,* 515 U.S. at p. 658 [115 S.Ct. at p. 2393]; see also *Loder* v. *City of Glendale, supra,* 14 Cal.4th at p. 925 (conc. and dis. opn. of Chin, J.) [". . . all the leading cases observe that such indirect monitoring is minimally intrusive"].)

▮ Plaintiff's constitutional challenge thus focuses on his interest to be free from disclosure of the materials he has ingested. (*Vernonia School Dist.*

*47J* v. *Acton, supra*, 515 U.S. at p. 658 [115 S.Ct. at p. 2393].) Plaintiff has a legally recognized privacy interest in precluding dissemination or misuse of such sensitive and confidential information. (*Hill* v. *National Collegiate Athletic Assn., supra*, 7 Cal.4th at p. 35.)

However, plaintiff's expectation of privacy in the materials he ingested was diminished by the advance notice he received of the District's random drug testing program. The District informed its employees in advance of the Substance Abuse Policy and provided a six-month grace period in which the employee could seek substance abuse treatment and counseling without any termination consequence. Plaintiff's awareness of the policy is evidenced by his vocal criticism of the policy at the District's informational meetings.

■ Although advance notice of drug testing does not automatically defeat an employee's argument that the testing is unconstitutional, it does decrease his expectation of privacy. (*Piroglu* v. *Coleman* (D.C. Cir. 1994) 25 F.3d 1098, 1103 [306 App.D.C. 392].) Advance notice of drug testing minimizes the program's intrusion on privacy interests. (*Treasury Employees* v. *Von Raab, supra*, 489 U.S. at p. 672, fn. 2 [109 S.Ct. at p. 1394].) The element of surprise inherent in a random testing program has been found minimized when advance notice of the implementation of the policy was given to the affected employee. (*Intern. Broth. of Teamsters* v. *Dept. of Transp., supra*, 932 F.2d at p. 1303.)

The randomness of a drug testing program has been found to have beneficial effects. It operates as a more effective deterrent to substance abuse in the workplace. (*Intern. Broth. of Teamsters* v. *Dept. of Transp., supra*, 932 F.2d at p. 1303; *Loder* v. *City of Glendale, supra*, 14 Cal.4th at p. 869.) It also eliminates the opportunity for harassment, real or alleged, which can result from reasonable cause testing. (*IBEW, Local 1245* v. *Skinner, supra*, 913 F.2d at p. 1460.)

### 2. *Interests of the District.*

■ In resolving whether the random drug test violated plaintiff's constitutional rights, plaintiff's expectation of privacy must be balanced against the interests of the District. We conclude that plaintiff's expectation of privacy was diminished by the fact that the District gave its employees six months' notice before it implemented its drug testing policy. We further conclude, for the reasons more fully discussed below, that plaintiff's expectation of privacy is outweighed by the District's legitimate and substantial safety-related reasons for randomly drug testing its construction and maintenance workers.

Under Labor Code section 6401, the District had a legal obligation to maintain a safe workplace. In an effort to fulfill this legal obligation, the

District instituted its Substance Abuse Policy. One of the express purposes of this policy was to "further enhance safety in the workplace for all employees." In accordance with this policy, the District reviewed all positions to determine if they were safety sensitive.

The District deemed the position of construction and maintenance worker safety sensitive due to the many hazards unique to this position and the danger those hazards posed to its employees. An employer need not wait for an accident to occur prior to instituting policies which address their safety concerns. (*Dimeo* v. *Griffin* (7th Cir. 1991) 943 F.2d 679, 684 [a governmental entity is not limited to addressing public safety problems after serious accidents reveal its want of foresight].)

Plaintiff contends that the United States Supreme Court has established a legal standard that permits random drug testing only "where the risk to public safety is substantial and real." (*Chandler* v. *Miller*, *supra*, 520 U.S. at p. 323 [117 S.Ct. at p. 1305].) Plaintiff argues that random drug testing should be limited to those cases in which the tested employee is responsible for the safety of the public at large, such as a member of a crew · on a passenger train or airline. Plaintiff concedes that no case has ever held that a coworker's life is not worthy of protection. However, plaintiff argues that an employer's interest in reducing the risk of injury to its employees is an insufficient basis for random drug testing.

We disagree. We hold that the District's interest in reducing a substantial and real risk of injury to plaintiff's coworkers justified the random drug test. The District's legitimate interest in protecting the life and safety of its employees through a random drug testing policy designed to detect and deter drug use is indistinguishable from the concern for public safety which "animates the general acceptance of drug testing by courts." (*IBEW, Local 1245* v. *Skinner, supra,* 913 F.2d at p. 1462.)

*Chandler* does not compel a different result. The question addressed in *Chandler* was the constitutionality of a statute requiring candidates for high office to submit to and pass a drug test in order to qualify for state office. The court found that the testing requirement protected a state interest in image and symbolism rather than safety. This was determined to be an insufficient basis for a warrantless search without individualized suspicion. (*Chandler* v. *Miller*, *supra*, 520 U.S. at pp. 321-322 [117 S.Ct. at pp. 1304-1305].) *Chandler* did not resolve the constitutionality of a random drug testing policy adopted by an employer to reduce the risk of injury to coworkers from a drug-impaired employee.

We further reject plaintiff's suggestion that random drug testing is constitutionally permissible only when a substantial number of people might be

injured by a drug-impaired worker. Random drug tests have been found constitutional due to:

1. The potential for injury to a patient by a scrub technician whose duties included setting out the proper instruments for surgery and counting sponges before the patient was sutured. (*Kemp* v. *Claiborne County Hosp.*, *supra*, 763 F.Supp. at p. 1368 ["Members of the public should not bear the risk that employees who might suffer from impaired perception and judgment due to drug or alcohol abuse will occupy positions wherein such employees are responsible for the care and safety of the public"].)

2. The potential for injury to a patient caused by a drug-impaired medical resident. (*Pierce* v. *Smith* (5th Cir. 1997) 117 F.3d 866, 874 [drug test of physician/resident-trainee, despite absence of drug testing policy or reasonable individualized suspicion, was found constitutional due to the risk of injury to others should the resident experience even a momentary lapse of attention].)

3. The potential for serious harm caused by a drug-impaired teacher. (*Knox County Educ.* v. *Knox County Bd. of Educ.* (6th Cir. 1998) 158 F.3d 361, 378 [teachers seeking promotion or transfer into teaching position deemed safety sensitive must be drug tested: "Even momentary inattention or delay in dealing with a potentially dangerous or emergency situation could have grievous consequences"].)

4. The potential for serious harm caused by a school custodian who tested positive for marijuana as the result of a random drug test of persons in safety-sensitive positions. (*Aubrey* v. *School Bd. of Lafayette Parish* (5th Cir. 1998) 148 F.3d 559, 565 [". . . the Board's need to conduct the suspicion-less searches pursuant to the drug testing policy outweighs the privacy interests of the employees in an elementary school who interact regularly with students, use hazardous substances, operate potentially dangerous equipment, or otherwise pose any threat or danger to the students"].)

These cases demonstrate that it is not the number of persons who could be injured by a drug-impaired worker that determines the constitutional validity of random drug testing. Instead, the cases focus on the degree, severity and immediacy of the harm posed. The " 'immediacy' " of the threat of injury and the fact that a single misperformed duty could have irremediable consequences have been determined to be important factors in determining the safety sensitivity of a job. (*Kemp* v. *Claiborne County Hosp.*, *supra*, 763 F.Supp. at p. 1367.) Irremediable consequences result when an employee is not able to rectify his or her mistake and the coworkers of the employee have

no opportunity to intervene before harm occurs. (*Ibid.*, citing *Harmon* v. *Thornburgh* (D.C. Cir. 1989) 878 F.2d 484, 491 [278 App.D.C. 382].)

We also reject plaintiff's assertion that his coworkers' safety was adequately assured by the fact a supervisory employee always worked in his construction and maintenance crew. Plaintiff contends the opportunity to scrutinize a worker in his day-to-day activities is an adequate remedy for the District's safety concerns. We disagree. As the United States Supreme Court noted, a drug-impaired individual will seldom display any outward signs detectable by the layperson. (*Vernonia School Dist. 47J* v. *Acton, supra,* 515 U.S. at pp. 663-664 [115 S.Ct. at p. 2396].)

We finally turn to plaintiff's contention that the duties he performed in the construction and maintenance position did not pose a significant hazard to the safety of others and, consequently, his position was incorrectly designated safety sensitive. The District's safety expert testified it is hazardous to operate power tools while under the influence of illegal drugs. Not only did plaintiff operate power tools in close proximity to his fellow workers, but he operated heavy equipment near them as well.

Plaintiff operated a sloper which was pulled into and out of ditches by a Caterpillar operated by a second worker. Due to the nature of the working environment, there was always the potential that one of the pieces of heavy equipment would fall on its side and injure the operator or another member of the crew.

Plaintiff also operated a boom to lower pipe sections into a trench. The boom could lift items that weighed as much as 1,500 pounds. If, as a result of the negligence of a drug-impaired worker, the item being lifted fell on a member of the crew in the trench, the injury to the crew member could be lethal.

Another requirement of plaintiff's position was to repair the District's pipes. In order to make the repairs, an employee had to crawl up to one-half mile through the pipe. The potential for injury from a collapsing pipe, gas fumes, and from water and debris which had collected within the pipe was so severe that even plaintiff's expert witness deemed this job "[e]xtremely dangerous." Should a drug-impaired employee become claustrophobic or disoriented in the pipe, the hazards inherent in the job would spread to the employee's coworkers and other persons called upon to rescue the disabled employee. The District had a legitimate need to avoid such risks.

Plaintiff's foreman testified that on occasion plaintiff was his "top man," the member of the crew responsible for the safety of the worker crawling

through the pipe. If a rescue became necessary and the top man was drug impaired, the risk of injury to the pipe crawler would significantly increase. The District had an obligation to ensure that an already hazardous job was not made more dangerous by a drug-impaired worker.

The hazards inherent in the operation of heavy equipment and power tools in close proximity to crew members were enhanced by the unique working conditions within the District. Almost all of the construction work performed by plaintiff was done in or around a trench. There was an ever-present danger that the trench might collapse or the worker might fall into the trench.

The hazardous environment in which plaintiff's work was performed is analogous to the hazardous working environment discussed in *American Federation of Labor* v. *Unemployment Ins. Appeals Bd.* (1994) 23 Cal.App.4th 51 [28 Cal.Rptr.2d 210]. The employee therein was a member of the housekeeping staff on an offshore oil drilling platform. The worker was discharged for refusing to submit to a drug test. The worker's application for unemployment compensation benefits was denied on the basis that his refusal to take the test was misconduct. In upholding the decision of the Unemployment Insurance Appeals Board, the appellate court found that the hazardous work environment justified the drug testing policy. The court noted that a slip and fall in a kitchen of a restaurant or hotel might not endanger anyone but the worker. However, a similar accident on an oil platform could endanger all of the workers on the platform, given the potential of a grease fire, which could quickly become a significant threat. (*American Federation of Labor*, *supra*, 23 Cal.App.4th at p. 66.) The court held that because the worker therein knew he could be drug tested at any time, his privacy interests were minimal and these interests did not outweigh the business and safety interests of his employer. (*Id.* at p. 67.)

The safety concerns of the employer in *American Federation of Labor* stemmed from the hazardous environment in which the employee worked. Here, there exist both a hazardous working environment and hazards inherent in the work itself. Both factors support the District's decision to designate the construction and maintenance worker position safety sensitive.

The constitutionality of drug testing is determined on a case-by-case basis. (*Harmon* v. *Thornburgh*, *supra*, 878 F.2d at p. 490, fn. 9 [the United States Supreme Court has mandated a case-by-case balancing of individual and societal interests]; *Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at p. 55.) We find, upon a de novo review of this case, that the legitimate safety concerns of the District justified the safety-sensitive classification of plaintiff's construction and maintenance position. We conclude that the

District's interest in minimizing the risk of injury to its employees outweighs the plaintiff's privacy interests. Therefore, the drug test which resulted in plaintiff's termination was constitutionally valid.

## DISPOSITION

The judgment is reversed. Each party is to bear its own costs on appeal.

Thaxter, Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied June 9, 1999, and respondent's petition for review by the Supreme Court was denied August 25, 1999.