Filed 4/8/15  Aro v. Legal Recovery Law Offices CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SETH W. ARO et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>LEGAL RECOVERY LAW OFFICES, INC., et al.,<br><br>    Defendants and Appellants. | D065422<br><br><br><br>(Super. Ct. No. 37-2012-00100913-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

The Welch Law Group and Eric M. Welch, for Defendants and Appellants.

No appearance for Plaintiffs and Respondents.

### INTRODUCTION

After a bench trial, the trial court found a random drug test administered by a debt collector, Legal Recovery Law Offices (LRLO), to its employees to be unreasonable and outrageous and further found this conduct was intended to and did cause employees Seth W. Aro and James T. O'Toole severe emotional distress.  LRLO appeals the judgment in favor of Aro and O'Toole for intentional infliction of emotional distress contending

(1) their cause of action is barred by the workers' compensation exclusivity doctrine and (2) there was insufficient evidence to support the court's findings on the elements of intentional infliction of emotional distress. We disagree with both contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A

Aro and O'Toole (collectively, plaintiffs) were hired by LRLO as debt collectors. Their duties were to find information about the debtors and attempt to contact them to arrange for voluntary payment before undertaking additional legal efforts. If the cases were prosecuted successfully and judgment was awarded, the collectors could make a commission in addition to their hourly rate.

The hiring process did not include preemployment drug testing and, prior to October 2011, no employee was drug tested at LRLO. In 2008, the employee manual provided the use of illegal drugs and the abuse of alcohol would not be tolerated at the workplace and the use, sale or possession of drugs at the workplace would be grounds for termination. However, the manual did not provide for random drug testing.

The employee manual changed in 2011. The revised manual stated in pertinent part: "The company is dedicated to providing employees with a workplace that is free of drugs and alcohol. The company discourages drug and alcohol use by its employees . . . . [¶] . . . [¶] For the safety of our employees and clients, the company reserves the right to test any employee for the use of illegal drugs or alcohol. This may be done in cases where the employee's job carries a risk of injury or accident due to such use or there is an apparent

inability to perform the requirements required of that position.  [¶] Specific jobs may at the company's discretion require regular drug testing.  Such a test may be conducted after an accident or with probable cause of impairment while on the job.  Under those circumstances the employee may be driven to a certified lab at the company's expense for the drug test."

The plaintiffs acknowledged receipt of the employee manual.  They were provided copies by e-mail.  However, when they asked what changes were made, they were told they could review it on their own time or make an appointment to review a physical copy with a manager.  Aro testified the employee manual was available online, but there was no way to compare it to the original version.  When he asked what changes were made, he was told to read it and figure it out.

B

In October 2011 Aro and O'Toole were unexpectedly required, along with all other employees to take a drug test in a public bathroom.  Aro was working at his desk when he was told to go to a conference room where other employees were drinking cups of water.  The LRLO controller handed him a consent form for the drug test.  When Aro refused to sign the consent form and returned to his desk, he was summoned to a manager's office where he was told if he did not go back and sign the consent form to take the drug test, he would be sent home and they would "figure out what to do" with him.  Aro interpreted this as a threat that he would be fired if he did not take the drug test.  Aro signed the consent form and submitted to the drug test.  He was required to sign a second form in the bathroom.  He was then given a cup and someone watched him while he provided the urine

3

sample. Aro's test result apparently came back positive for marijuana. However, Aro was never given a copy of his drug test results.

O'Toole heard rumors the company was drug testing when he was suddenly tapped on the shoulder and told "come with me." He was led into a room with other people and told to sign a consent form. O'Toole objected to signing the consent form and to the drug testing without a compelling cause. He returned to his desk, but was then called in to speak to managers who told him to sign the form. When he asked what would happen if he did not sign the form, a manager replied, "We will figure it out. You will be suspended and we will figure out what to do with you later." O'Toole asked for a copy of the employee manual, remembering they had changed the manual recently. He was told to look it up from his e-mail.

O'Toole testified he started to panic. He was a cancer patient and had a cannabis card to alleviate his symptoms. He was concerned, even though he did not come to work under the influence, he would test positive for cannabis and it could impact his career. The company blocked his e-mail when he tried to look up things or to e-mail the employee manual to himself. When he asked again what would happen if he did not sign the consent form, he was told he would be suspended and they would "figure out what to do." So, O'Toole signed the consent form.

When O'Toole tried to give the sample, two men were standing at the bathroom door. He was given a cup and asked to sign another form. He produced a small sample, but was informed it was "too watery and insufficient." He was told he had to retest and was sent back to drink more water. When he tried again to give a sample, he was unable to do so.

4

Over the weekend, O'Toole conducted research and sent an e-mail to a supervisor outlining his concerns. He expressed his feelings about the "captive random" drug testing, which he felt was "very wrong." He explained he could not "perform on demand" and was "upset . . . with the gestapo standing at the door of the bathroom stall." O'Toole further described how he went back to his desk to get water and to check his e-mail for the employee manual when he discovered his e-mail account was blocked. He stated, "I tried to go back and do the test, but by this time my blood pressure was up and my shift was ending." He was upset at how he was treated and felt the random drug test was illegal. He initially said he would take the drug test, but changed his mind.

When he returned to work the following Monday, he sent an e-mail to another supervisor stating that although he initially agreed to take the drug test after "some intimidation from management," he rescinded his permission because he did not believe the company had shown cause for drug testing him. He offered to provide the results of his yearly drug panel from his doctor upon a showing of good cause.

O'Toole questioned the owner of LRLO, attorney Mark Walsh, about the cases he read over the weekend and said they could not test employees without cause. Walsh responded they were "comfortable" with the testing. O'Toole returned to work, but waited "for the ax" for months because he refused to take the test. O'Toole felt the "faucet had turned off" and his numbers dropped to the extent he was not able to pay for his medication without giving up food. He also had trouble with his blood pressure. He felt intimidated. Ultimately, he was let go after he got into an argument with another employee and called in sick for two days because he could not control his blood pressure.

C

Aro and O'Toole each argued in closing statements the company did the drug test to intimidate employees into quitting because they had made reasonable claims for unpaid overtime. Prior to the drug test, both Aro and O'Toole were summoned to Walsh's office to discuss whether they thought they were owed unauthorized overtime. Walsh asked a series of questions about whether Aro took his lunch and rest breaks. Aro testified he felt intimidated by the questioning and said he was not owed overtime because he was afraid of losing his job. O'Toole received a document regarding meals and rest periods and was asked if he was owed any overtime money. O'Toole felt he was owed money for overtime for working on Saturdays, but felt intimidated and wanted to keep working for LRLO, so he said he was not owed any overtime money.[1]

According to LRLO, it decided to implement the October drug test because there were accusations in separate litigation of "rampant" drug use in the company and there were occurrences of fighting on the floor, obscene language and threats of violence. However, the company controller admitted the plaintiffs were not suspected of using drugs at work. O'Toole testified there was no drug culture among employees at LRLO.

LRLO managers testified the drug test was voluntary, no one was forced to take the test and there were no adverse consequences for refusing to test. LRLO managers also testified the company and its employees have access to private information such as social

---

[1]    Additionally, around the time of the drug testing, Walsh was the subject of disciplinary charges by the State Bar of California for failing to comply with court orders and for not paying sanctions.

6

security numbers, credit cards, checking account information and credit reports. Therefore, it considered its employees as working "security sensitive positions."

The employee drug test results were reviewed by a few LRLO managers, but no results were reviewed with the employees. According to LRLO's controller, no employee suffered adverse consequences as a result of the test results.

D

Aro and O'Toole filed a complaint alleging four causes of action against LRLO and Walsh: (1) breach of contract and the implied covenant of good faith; (2) interference with the exercise of civil rights (Civ. Code, § 52.1); (3) unpaid overtime wages (Lab. Code, § 510); and (4) intentional infliction of emotional distress.

The case came on for a bench trial with Aro and O'Toole representing themselves in propria persona. They both dismissed their first cause of action for breach of contract at the start of trial. During trial, the court granted defense motions for nonsuit as to the second cause of action for violation of Civil Code section 52.1 and the third cause of action for violation of Labor Code section 510 for unpaid overtime wages. The court also dismissed Walsh as an individual defendant.

After the close of evidence, LRLO asserted for the first time the action was barred by the workers' compensation exclusivity rule. The court reviewed the complaint and the answer, including affirmative defenses identified by LRLO, and determined workers' compensation exclusivity was not pleaded as an affirmative defense, however it took the issue under submission.

7

The court issued a statement of intended decision finding in favor of Aro and O'Toole. The court rejected the workers' compensation exclusivity defense concluding, in part, the answer did not assert this affirmative defense and "[t]he compensation bargain does not encompass conduct that contravenes a fundamental public policy or exceeds the risks inherent in the employment relationship."

As to the intentional infliction of emotional distress cause of action, the court determined the circumstances under which Aro and O'Toole were subjected to the drug test were unreasonable and outrageous. It found, based on a totality of the evidence, LRLO intended to cause plaintiffs emotional distress and its conduct was a substantial factor in causing plaintiffs' severe emotional distress. The court found "Plaintiffs' description of their anguish, nervousness, anxiety, worry, humiliation and shame was credible." It awarded Aro $15,133 and O'Toole $15,868 in noneconomic damages. It also awarded $1 in exemplary damages after finding plaintiffs "proved by clear and convincing evidence that one or more directors, officers or managing agents of . . . LRLO engaged in malice, oppression or fraud in subjecting [p]laintiffs to an unreasonable drug test."

There is no indication in the record LRLO timely objected to the court's statement of intended decision. The court entered judgment in favor of plaintiffs.

## DISCUSSION

### I

*General Principles Regarding Review of Statement of Decision and Standard of Review*

" 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts

8

will be resolved in support of the determination of the trial court decision.' " (*In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342.) Additionally, " 'if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, [the reviewing court] should resolve that doubt in favor of the finding.' " (*Mashon v. Haddock* (1961) 190 Cal.App.2d 151, 167.)

"If the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.) The waiver rule does not apply to legal errors appearing on the face of the statement of decision. (*Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 349, fn. 3.)

We review the trial court's findings of fact, both express and implied, for sufficiency of the evidence. (*Fladeboe v. American Isuzu Motors Inc.*, *supra*, 150 Cal.App.4th at p. 60.) " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance

with the standard of review so long adhered to by this court.' " (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

## II

### *Workers' Compensation Defense*

LRLO contends the workers' compensation exclusivity rule precludes plaintiffs' recovery for intentional infliction of emotional distress. We do not agree.

### A

The court concluded LRLO did not properly plead exclusivity as an affirmative defense. LRLO contends it asserted an affirmative defense based on a general statutory exemption and further contends workers' compensation exclusivity "is put at issue, and need not be alleged as an affirmative defense, if the complaint affirmatively alleges facts indicating that the conditions of coverage are present and alleges no facts that would establish an exception to the exclusivity rule or negate the conditions of coverage." (*Singh v. Southland Stone, USA, Inc.* (2010) 186 Cal.App.4th 338, 366 (*Singh*).) LRLO contends plaintiffs' complaint alleges facts bringing it within the conditions of coverage so LRLO was not required to specifically plead the affirmative defense.

However, the record does not include any pleadings upon which we may independently evaluate LRLO's contentions with respect to either the allegations in the complaint or the affirmative defenses pleaded in the answer. Therefore, we cannot conclude the trial court prejudicially erred in rejecting this affirmative defense based on a pleading failure. " 'It is the duty of an appellant to provide an adequate record to the court establishing error. Failure to provide an adequate record on an issue requires that the issue

10

be resolved against appellant. [Citation.]' [Citation.] This principle stems from the well-established rule of appellate review that a judgment or order is presumed correct and the appellant has the burden of demonstrating prejudicial error." (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348.)

B

Even if we presume the affirmative defense of workers' compensation exclusivity was pleaded as an affirmative defense, we are not persuaded the random drug testing complained of here is encompassed within the "compensation bargain." "Workers' compensation ordinarily provides the exclusive remedy for an injury sustained by an employee in the course of employment and compensable under the workers' compensation law." (*Singh*, *supra*, 186 Cal.App.4th at p. 365.) "The underlying premise behind this statutorily created system of workers' compensation is the ' "compensation bargain." ' [Citation.] Pursuant to this presumed bargain, 'the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' " (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811.)

However, "the workers' compensation exclusivity rule applies only if the risks resulting in the injury were encompassed within the 'compensation bargain.' " (*Singh*, *supra*, 186 Cal.App.4th at p. 366.) "The compensation bargain does not encompass conduct that contravenes a fundamental public policy or exceeds the risks inherent in the

11

employment relationship."  (*Ibid*.)  "[W]hen employers step out of their roles as such and commit acts which do not fall within the reasonably anticipated conditions of work, they may not then hide behind the shield of workers' compensation."  (*Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1431 [exclusivity doctrine not applicable to intentional infliction of emotional distress claim based on sexual harassment]; see *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 723 [false imprisonment of employee during theft investigation not within scope of the exclusivity rule because "such action cannot be said to be a normal aspect of the employment relationship"]; *Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1492 [emotional distress claims based on work-related injury discrimination not barred by exclusivity rule].)  "[I]n some exceptional circumstances the employer is not free from liability at law for his intentional acts even if the resulting injuries to his employees are compensable under workers' compensation."  (*Johns-Manville Products Corp. v. Superior Court* (1980) 27 Cal.3d 465, 473, 478-479 [exclusivity rule not applicable to employer liability for aggravated disease due to fraudulent concealment].)

In *Operating Engineers Local 3 v. Johnson* (2003) 110 Cal.App.4th 180, 190, the court concluded an invasion of the constitutional right of privacy "by definition necessarily involve[s] conduct [that goes] beyond 'broadly based and widely accepted community norms' of acceptable employer conduct."  In that case, a jury found an employer violated the plaintiff's right to privacy by announcing in a meeting in the presence of other employees the plaintiff would be reprimanded, directing her to write her own letter of reprimand and then distributing the minutes publishing the reprimand to additional employees.  (*Id*. at

12

p. 184.)  The appellate court concluded the plaintiff's claims were not barred by the exclusive remedy doctrine because the conduct "violated a right conferred by the California Constitution and thus was contrary to a fundamental public policy.  The violation of such a clearly articulated public policy reinforces the basis for holding defendants' conduct to exceed what may be considered normal employer behavior within the compensation bargain."  (*Id*. at p. 190.)

*Semore v. Pool* (1990) 217 Cal.App.3d 1087, a case relied upon by LRLO, is distinguishable.  The *Semore* court concluded an employee's termination for failing to submit to a pupilary eye reaction test to determine if an employee was under the influence of drugs was a normal part of the work relationship in that case and the exclusive remedy of the workers' compensation law applied to an intentional infliction of emotional distress cause of action.  (*Id*. at pp. 1092-1093, 1104.)  However, the court noted this test was "far less intrusive and burdensome than . . . blood, urine or breath tests."  (*Id*. at p. 1099.)  Additionally, because the employer operated a large chemical plant, the court recognized it might have had legitimate safety concerns for certain employees.  (*Id.* at p. 1100.)

In contrast, based on the evidence presented at trial, the trial court here found  LRLO provided "wholly inadequate notice" of the drug test and the invasive circumstances under which it subjected Aro and O'Toole to drug testing were unreasonable and outrageous.  Additionally, the court determined, as debt collectors, plaintiffs "did not occupy 'safety or security sensitive' positions" and "LRLO's efforts to characterize the nature of [plaintiffs'] work at such is not reasonable."  Under these circumstances, we conclude the random drug test administered in this case violated a fundamental right to privacy and exceeded the risks

and expectations inherent in the employment relationship.  (*Operating Engineers Local 3 v. Johnson*, *supra*, 110 Cal.App.4th at p. 190.)  Therefore, the workers' compensation exclusivity rule does not apply.[2]

### III

### *Intentional Infliction of Emotional Distress*

LRLO also contends Aro and O'Toole did not prove the necessary elements of their claim for intentional infliction of emotional distress.  To establish a claim for intentional infliction of emotional distress, a plaintiff must prove:  (1) the defendant's conduct was outrageous; (2) the defendant intended to cause the plaintiff harm; (3) he or she suffered severe emotional distress; and (4) the defendant's conduct was a substantial factor in causing plaintiff's severe emotional distress.  (CACI No. 1600; *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.)

---

[2]      Contrary to LRLO's contention, *Luck v. Southern Pacific Transportation* (1990) 218 Cal.App.3d 1, does not stand for the proposition drug testing involves "a 'privacy interest' but not a 'fundamental public policy' interest."  The Court of Appeal in *Luck* concluded an employee's termination for refusing to submit to urinalysis did not state a cause of action for wrongful termination in violation of public policy, in part, because there was no firmly established policy limiting or precluding urinalysis drug testing at the time.  (*Id*. at pp. 27-29.)  However, "the case does not suggest that defendants [are] free to disregard [employee] privacy rights without . . . consent, or that such unilateral action [is] part of the normal employment relationship."  (*Operating Engineers Local 3 v. Johnson*, *supra*, 110 Cal.App.4th at p. 191, fn. 8.)  Of note, the *Semore* court determined there is a public policy concern in an individual's right to privacy and the plaintiff had sufficiently stated a cause of action for wrongful termination in violation of public policy to survive demurrer.  (*Semore v. Pool*, *supra*, 217 Cal.App.3d at p. 1098.)  The court indicated the dispute required balancing the employee's privacy expectations against the employer's need to regulate the conduct of its employees at work, which could not occur at the pleading stage.  (*Id*. at pp. 1097, 1100.)

A

The trial court found LRLO's conduct in administering the random drug test met the first element because it was unreasonable and outrageous.  The California Constitution contains an explicit guarantee of the right of privacy.  (Cal. Const., art. I, § 1; *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 326.)  Article I, section 1 of the California Constitution provides:  " 'All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*.' "  "[I]n many contexts, the scope and application of the state constitutional right of privacy is broader and more protective of privacy than the federal constitutional right of privacy as interpreted by the federal courts."  (*American Academy of Pediatrics v. Lungren*, *supra*, at pp. 326-327.)

This state constitutional provision " 'creates a legal and enforceable right of privacy for every Californian.' "  (*White v. Davis* (1975) 13 Cal.3d 757, 775.)  "The party claiming a violation of the constitutional right of privacy established in article I, section 1 of the California Constitution must establish (1) a legally protected privacy interest, (2) a reasonable expectation of privacy under the circumstances, and (3) a serious invasion of the privacy interest."  (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 338, citing *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39-40.)

15

"Cases generally hold that a drug test of an existing employee without any individualized suspicion is unreasonable unless the employee is in a safety- or security-sensitive position." (*Smith v. Fresno Irrigation Dist.* (1999) 72 Cal.App.4th 147, 160 citing *Kraslawsky v. Upper Deck Co.* (1997) 56 Cal.App.4th 179, 187, fn. 8 (*Kraslawsky*); *Kemp v. Claiborne County Hosp.* (S.D.Miss. 1991) 763 F.Supp. 1362, 1367 ["the safety sensitivity of an employee's job is a highly important factor in the balancing test to determine the reasonableness of a drug testing procedure"].)

LRLO contends *Kraslawsky*, *supra*, 56 Cal.App.4th 170 compels the conclusion drug testing is not outrageous for purposes of intentional infliction of emotional distress even if it is constitutionally unreasonable. We do not agree. In *Kraslawsky*, the court reversed summary judgment on state constitutional privacy and wrongful termination claims after concluding a triable issue of material fact existed regarding whether the employer had reasonable cause to believe the employee was under the influence of intoxicants. However, the court affirmed summary adjudication of the intentional infliction of emotional distress cause of action based on the employee's testimony she did not find the proposed drug testing procedure intrusive. The employer in that case requested the employee drive to a medical facility and provide a urine sample for a drug test, which would not have been visually observed. She would have entered a bathroom fully clothed and the test would have been monitored only by a nurse standing outside the bathroom door. (*Kraslawsky*, at p. 183 & fn. 2.)

In this case, however, Aro and O'Toole testified they were not given notice of a random drug testing policy. Although the employee handbook was amended in 2011 to include a drug testing policy, it did not provide notice of random drug testing without cause. The amended handbook reserved the right to test an employee for the use of illegal drugs or alcohol, but went on to say, "[t]his may be done in cases where the employee's job *carries a risk of injury or accident due to such use* or there is *an apparent inability to perform the requirements required of that position*." (Italics added.) The handbook further provided that specific jobs, which are not defined, may require regular drug testing, but that such a test "may be conducted *after an accident* or *with probable cause of impairment while on the job*," but under those circumstances "the employee may be driven to a certified lab at the company's expense for the drug test." (Italics added.) Based on the plain meaning of this language, we conclude LRLO's drug testing policy required individualized suspicion of drug use or safety concerns involving a risk of injury or accident. It did not allow random testing without cause for employees, even if they handled sensitive private information.

The trial court concluded there was no credible evidence of individualized suspicion of illegal drug use by either Aro or O'Toole. Instead, they were "tapped on the shoulder" while working at their desks and directed to submit to immediate drug testing under threat of suspension or loss of job if they did not comply. They were required to sign a consent form in a conference room in the presence of other employees. They were required to stand in line for a public restroom in the office building and they were observed while they provided the urine sample. The trial court found their testimony on this issue more credible than the testimony provided by the defense.

17

LRLO's attempt to minimize the outrageous nature of the conduct by cherry picking portions of the evidence is not helpful or persuasive. Although O'Toole was not successful in submitting an acceptable sample for testing and ultimately declined to complete the test, the trial court found his testimony about how he was subjected to the initial drug testing procedures credible. O'Toole did offer to provide LRLO copies of his routine testing from his doctor's office, but offered to make those results available only if the employer could show good cause. What he described in an e-mail to his supervisor over the weekend as "no big deal" was not the drug testing process, but his personal inability to "perform on demand." He clearly expressed his concern and outrage at how the test was administered and monitored. Based on the totality of the evidence, we conclude there is substantial evidence to support the court's finding the testing procedure in this case was both unreasonable and outrageous.

B

As to the second element, the court found "based on the totality of the evidence" LRLO intended to cause Aro and O'Toole emotional distress. We conclude there is substantial evidence to support the court's finding. When both Aro and O'Toole objected to the drug testing, they were told initially to return to their desks and then advised by supervisors they would be suspended if they did not submit to the testing and LRLO would "figure out" what to do with them. As a result, both men signed the consent forms and attempted to submit to the drug testing.

18

Additionally, there is evidentiary support for the argument the drug testing was done, at least in part, to threaten and intimidate Aro and O'Toole in response to their claims of unpaid overtime. After they raised the overtime issue with management, they were summoned to Walsh's office where they were questioned about the claims and felt they were being intimidated. Thereafter, LRLO undertook the drug testing.

There had never been drug testing at the company before. Even though testing was allegedly done in response to "rampant" drug use among employees, no employees were given their results and no employees were fired as a result of the testing. Even though Aro apparently tested positive for marijuana, he was not given his results. Instead, LRLO allowed both Aro and O'Toole to continue to work for months "waiting for the ax" while the "faucet . . . turned off" and their production numbers declined. We conclude there is substantial evidence to support the finding LRLO intended to cause Aro and O'Toole emotional distress.

## C

Similarly, we conclude there is substantial evidence to support the trial court's finding LRLO's conduct was a substantial factor in causing Aro and O'Toole severe emotional distress, which included "anguish, nervousness, anxiety, worry, humiliation and shame." "[R]ecovery may be had for emotional distress alone without resulting physical disability" (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 396-397), and " 'the right to compensation exists even though no monetary loss has been sustained.' " (*Grimes v. Carter* (1966) 241 Cal.App.2d 694, 699.) "[E]motional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation,

19

embarrassment, anger, chagrin, disappointment or worry." (*Fletcher*, at p. 397.) " 'The emotional distress must in fact exist, and it must be severe.' " (*Id.* at p. 396.)

O'Toole specifically testified about how the drug testing procedure upset him, caused his head to spin, caused him to panic, and caused his blood pressure to rise. He described how he was unable to "perform on demand" due to his emotional condition. He also described his emotional distress after the testing. He described how he "waited for the ax" for months because he objected and refused to complete the test, how it seemed the "faucet had turned off" and he received less pay because his numbers were dropping causing him to forego food to pay for medications, and how he had more problems with his blood pressure. He explained his distress culminated in an argument with a supervisor regarding why a newer employee was getting more business than he was, which lead him to call in sick for a few days because his blood pressure was out of control. When he returned, he was terminated.

Aro described how he had "one minute" to decide, after he objected to the drug testing, if he would take the test or be fired. He described going back to the conference room, signing the consent form, waiting in line to walk into the public bathroom to take the drug test, being required to sign a second form in the bathroom and being watched while he provided a sample. This evidence supports a reasonable inference he submitted to drug testing out of fear and he felt trapped, violated, humiliated and angry by the situation, as he argued in opening and closing statements. As with O'Toole, Aro worked for several months after the drug testing in fear for his job, without being given the results of his test.

20

The trial court, which heard the evidence and observed the witnesses, found both O'Toole and Aro suffered severe emotional distress caused by LRLO's conduct. We conclude there is sufficient evidence to support the court's express and implied findings of fact on this issue.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.